**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**NORTHEASTERN DIVISION**

| | |
|---|---|
| **ANNETTE T. BROOKS,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **J.C. PENNEY LIFE INSURANCE CO.,** | ) |
| | ) |
| **Defendant.** | ) |

**CIVIL ACTION NO. 00-JEO-3045-NE**

## MEMORANDUM OPINION

This matter is before the court on the defendant's motion for summary judgment filed on August 23, 2001. (Doc. 18).[1]  Also before the court is the "Plaintiff's Motion to Allow a Reply Brief in Opposition to the Defendant's Motion for Summary Judgment," filed on June 28, 2002, (doc. 35), and the defendant's motion to supplement the record (doc. 39).  Upon consideration of the record, the submissions of the parties and the relevant law, the court finds that the defendant's motion for summary judgment is due to be granted, the "Plaintiff's Motion to Allow a Reply Brief in Opposition to the Defendant's Motion for Summary Judgment" is due to be denied, and the defendant's motion to supplement the record is due to be denied.

## I.    PROCEDURAL BACKGROUND

Plaintiff Annette T. Brooks ("Mrs. Brooks" or "plaintiff") claims that defendant J.C. Penney Life Insurance Company ("JCPL" or "defendant") committed breach of contract, a variety of torts and bad faith failure to pay when, upon the death of the plaintiff's spouse, JCPL denied a claim the plaintiff made under an accidental death and dismemberment policy it had

---

[1]References to "Doc. __" are to the documents as numbered by the clerk of court in the court's record of the case.

issued to her and her spouse.  The plaintiff initially filed this action in the Circuit Court of

Cullman County on September 27, 2000, and JCPL removed it to this court on October 27, 2000.

(Doc. 1).

JCPL filed the instant motion for summary judgment on August 23, 2001, arguing that it

is due summary judgment with respect to all of the plaintiffs' claims.  (Docs. 18, 21).  The

plaintiff responded, arguing that the court should deny JCPL's motion for summary judgment as

to the breach of contract and bad faith claims, but conceding that summary judgment is due as to

all the other claims.[2]  (Doc. 25 at 1-2).  The court will therefore address the motion only as it

pertains to the breach of contract and bad faith claims asserted by the plaintiff.

## II.    FACTUAL BACKGROUND[3]

Mrs. Brooks purchased and was issued Certificate of Insurance Number 74AY193130

(the "Certificate") by JCPL under a group policy of accidental death and dismemberment

insurance, Policy Number 25292, issued to J.C. Penney Company, Inc. (the "Policy"), which

provided accident insurance coverage for Mrs. Brooks and her husband.  (*See* Doc. 20 at Exs.

1-2).  The benefits described under Parts I and II of the Certificate are inapplicable here, as they

concern injuries associated with travel.  (Doc. 20, Ex. 1 at 4).  The benefits described under Part

III are for "all other injuries resulting in a loss."  (*Id.*).  Part III describes benefits due "[i]f a

---

[2]The plaintiff subsequently filed a "Motion to Allow a Reply Brief in Opposition to the Defendant's Motion for Summary Judgment," on June 28, 2002 (doc. 35), which the court will address hereinbelow.

[3]The facts set out below are gleaned from the parties' submissions and are viewed in a light most favorable to the plaintiff.  They are the "'facts' for summary judgment purposes only. They may not be the actual facts. *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994)." *Underwood v. Life Insurance Co. of Georgia*, 14 F. Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).

Covered Person is: 1. Injured in an accident not covered under Part I or Part II; and 2. not otherwise excluded in the policy." (*Id.*). "Injury" is defined by the Policy as "bodily injury caused by an accident occurring while the insurance is in force resulting: 1. directly and independently of all other causes." (*Id.* at 3). Certain losses and injuries are excluded from coverage. In pertinent part, the Certificate states that "[n]o benefit shall be paid for Loss or Injury that:...7. is due to disease; bodily or mental infirmity; or medical or surgical treatment of these." (Doc. 20, Ex. 1 at 5).

On March 12, 1999, Mr. Brooks went to Dr. Ben Bostick's office, complaining of a history of increasing abdominal distention and swelling in his lower extremities. (Doc. 20 at Ex. 3). Dr. Bostick took an x-ray, which showed a "rather significant right pleural effusion." (*Id.*). In his notes, Dr. Bostick stated as follows: "With his chronic smoking and the history of a questionable lung mass in the past by prior chart review, I think it's prudent to go ahead and do a CT of the chest to make sure there's no intrathoracic process going on." (*Id.*). Dr. Bostick referred Mr. Brooks to the Woodland Medical Center, where a CT scan of Mr. Brooks's chest was performed on March 15, 1999, revealing a "[l]arge right-side pleural effusion probably on the order of 1500-1800 cc's." (*Id.* at Ex. 5). After the CT scan procedure, Mr. Brooks developed a rash and his condition deteriorated. (*Id.*). He died in spite of the attempts of medical personnel to resuscitate him. (*Id.*). On his death certificate, the immediate cause of death is listed as "Anaphylactic Reaction to IV contrast,"[4] due to or as a consequence of right pleural effusion and possible lung cancer. (*Id.* at Ex. 11).

---

[4]The "IV Contrast" was apparently a type of dye administered to Mr. Brooks in order to facilitate his CT scan procedure.

3

Mrs. Brooks alleged in her deposition that Mr. Brooks died because the medical personnel erroneously administered Lidocaine to him in the course of responding to his anaphylactic reaction. JCPL summarizes this allegation as follows:

> Even though the available medical records do not provide additional information, Annette Brooks testified that Lidocaine was mistakenly administered to Mr. Brooks during treatment of this [anaphylactic] reaction. Specifically, she testified, "The Lidocaine is what killed him." (Deposition of Annette Brooks, p. 58, excerpt attached as Exhibit "6" to Defendant's Evidentiary Submission) [Doc. 20, Ex. 6 at 58]. Thus, Mrs. Brooks testified that Lidocaine was administered during the course of medical treatment for Mr. Brooks' anaphylactic reaction, clearly an additional infirmity affecting Mr. Brooks.

(Doc. 21 at 3, n.3). It is not entirely clear from her deposition testimony how Mrs. Brooks obtained this information. The court notes that it is not reflected in the medical records before the court, nor is it otherwise substantiated by the record evidence.

Mrs. Brooks made a claim for benefits under the Policy, characterizing Mr. Brooks's death as being caused by "accidental anaphylactic reaction to IV contrast," which claim was denied by JCPL after it had reviewed documents and records it had gathered pertaining to the claim. (Doc. 20 at Exs. 4, 7, 9). In a letter to Mrs. Brooks, JCPL explained its denial as follows:

> This policy provides benefits for the death of a covered person due to accidental bodily injury resulting directly and independently of all other causes. We refer you to the Exclusions on page 5 of the policy. It states, "No benefit shall be paid for Loss of [sic] Injury that:...7. is due to disease; bodily or mental infirmity; or medical or surgical treatment of these."

> According to the death certificate, your husband's death was due to anaphylactic reaction to intravenous contrast due to right pleural effusion due to possible cancer of the lung. The medical records received from Dr. Bostick and Woodland Medical Center indicated your husband's death followed a medical procedure that was performed for a disease. Based upon this information and the above exclusion, we are unable to provide benefits. It appears your husband's death does not come under the coverage terms of the policy.

4

(Doc. 20 at Ex. 9). Following the denial of benefits, Mrs. Brooks filed this action.

## III.   ANALYSIS

The court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Initially, the moving party bears the burden of proof "to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).

The moving party can satisfy his burden by presenting evidence that there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of her case on which she bears the ultimate burden of proof. *Celotex,* 477 U.S. at 322-323; FED. R. CIV. P. 56(a) and (b).

Should the moving party meet his burden of proof, "the burden shift[s] to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark,* 929 F.2d at 608. Material facts are those that might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Genuine material facts are those material facts that could cause a reasonable jury to return a verdict for the nonmoving party. *Anderson,* 477 U.S. at 248. The nonmoving party need not present evidence in a form necessary for admission at trial; however, the movant may not merely rest on the pleadings. *Celotex,* 477 U.S. at 324.

The court should consider the pleadings, depositions, and affidavits in the case before

5

reaching its decision, and all reasonable inferences should be made in favor of the nonmovant.

*Griesel v. Hamlin,* 963 F.2d 338, 341 (11th Cir. 1992). The judge's role is "not himself to weigh

the evidence and determine the truth of the matter but to determine whether there is a genuine

issue for trial." *Anderson,* 477 U.S. at 249.

### A.    Breach of Contract Claims

The plaintiff claims that JCPL breached the terms of the Policy by denying her claim for

benefits. JCPL argues that its denial of benefits was consistent with the terms of the Policy.

JCPL contends that, pursuant to the terms of the Policy and the applicable choice of law

provisions, the Policy must be interpreted under Illinois law. (Doc. 21 at 9). The plaintiff does

not dispute this contention. (Doc. 25 at 9-14).

The Policy, as JCPL points out, contains three levels of coverage, only one of which of

which could be applicable here--those available under Part III benefits. Part III coverage is for

"Benefit for all other injuries [those not covered under Parts I and II] resulting in a loss." (Doc.

21, Ex. 1 at 4). According to Part III,

> If a Covered Person is
>
> 1.    Injured in an accident not covered under Part I or Part II.; and
> 2.    Not otherwise excluded in the policy, we will pay the applicable benefit
>       specified in Part III of the Schedule of Insurance....

(*Id.*). According to JCPL, the loss was "otherwise excluded in the policy" because the Policy

provides that "[n]o benefit shall be paid for Loss or Injury that:...7. Is due to disease; bodily or

mental infirmity; or medical or surgical treatment of these." (*Id.* at 5). JCPL argues that Mr.

Brooks died as a result of medical treatment for a disease or bodily infirmity--that after he was

diagnosed with a right pleural effusion and possible cancer, he "participated in a course of

treatment by allowing the CT scan to be performed." (Doc. 21 at 11-12).

The plaintiff argues that the policy term "medical or surgical treatment" is vague and ambiguous and should not be interpreted to include diagnostic procedures such as the CT scan performed on Mr. Brooks.[5] (Doc. 25 at 8, 13-14). JCPL argues that the term does encompass diagnostic procedures. In support of this contention, JCPL cites an Illinois case, *Litman v. Monumental Life Ins. Co.*, 682 N.E.2d 135 (Ill. App. Ct. 1997).[6] In *Litman*, an insurer sought declaratory judgment that a medical treatment exclusion in an accidental death policy barred

---

[5]In support of her position, Mrs. Brooks offers the affidavit of a purported expert witness, Jack A. Taylor, Ph.D., who opines as to various matters, including that JCPL's "failure to define significant terms in the policy is improper," and "lead[s] to vagueness and ambiguity." (Doc. 24, attachment thereto). He also opines that the exclusion JCPL relied on to deny Mrs. Brooks's claim is "vague, ambiguous and unclear" and that the deposition of Karen Newton demonstrates that the JCPL applies the exclusions in the policy as it sees fit. (*Id.*). He also opines that JCPL knew or should have known it was improper not to define significant terms in the policy and that Mr. Brooks's death was an accident. (*Id.*). He further opines that JCPL did not adequately investigate the claim. (*Id.*).

Taylor's affidavit appears to consist primarily of legal conclusions, which are the province of the court to make, along with a few factual observations that the court is capable of making without the assistance of an expert. *See Lapham v. Hickey Steel Corp. v. Protection Mut. Ins. Co.*, 655 N.E. 2d 842 (Ill. 1995) (interpretation of insurance policy and its provisions is a question of law). Taylor's opinions thus do not help the court in analyzing the issues before it. In addition, insofar as the affidavit contains legal conclusions, it is inadmissible. *See Montgomery v. Aetna Cas. & Surety Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990).

[6]As additional support for its contentions, JCPL cites the following passage from COUCH ON INSURANCE:

> While the word "treatment" in its strictest medical sense probably excludes some preliminary steps, especially procedures which a medical professional would categorize as "diagnostic," the Courts have not generally recognized such a distinction. Instead, the typical judicial approach has been to view "treatment" broadly, as any activity or procedure which is a logical component of the entire process by which a medical professional would respond to a patient's complaints.

COUCH ON INSURANCE 3d, § 141:91.

coverage for the insured's death from a heart attack caused by a feeding tube that, after it was inserted following surgery, shifted, pierced through the superior vena cava and perforated the wall of the heart. *Litman*, 682 N.E.2d at 136-37. The medical treatment exclusion provided that the insurer "will not pay a benefit for a loss which is caused by, results from or contributed by:...(5) Sickness or its medical or surgical treatment, including diagnosis."[7] *Litman*, 682 N.E.2d at 136. The insurer argued that the insured's death "occurred in the course of, and because of, the medical treatment she was undergoing for her bowel obstruction." *Litman*, 682 N.E.2d at 137. The plaintiff contended that the death resulted from an accident, not medical treatment.

The *Litman* court cited *Reid v. Aetna Life Insurance Co.*, 440 F. Supp. 1182 (S.D. Ill. 1977), *aff'd*, 588 F.2d 835 (7th Cir. 1978), in which the insured, whose policy contained a medical treatment exclusionary clause, died after receiving the wrong medication intravenously while recuperating from surgery "performed for non-accidental ailments." *Reid*, 440 F. Supp. at 1182. The *Reid* court held that the death "was a direct consequence of medical treatment" and that

> [t]he accidental use of the killer drug as a carrier of the intended drug, in place of normal saline solution as such carrier, where such use was negligence amounting to medical malpractice, or an unavoidable act of God, or something in between, though obviously not prescribed, would not have occurred but for the treatment, and thus was a consequence thereof. Even though it be considered that the accidental death was not caused by or contributed to by the intended medical treatment, it was caused by the "accident" which occurred in the course of administering medical treatment.

*Reid*, 440 F. Supp. at 1183. The plaintiff in *Litman* attempted to distinguish this case by arguing

---

[7]The plaintiff makes much of the fact that the medical treatment exclusion in *Litman* contains the additional words, "including diagnosis." The *Litman* court's analysis does not turn on that part of the exclusion, however. The presence of such a phrase in the policy before the *Litman* court has no impact on the applicability of *Litman* in this case.

that the Hickman line was not inserted as a treatment, that the insured was able to take

nourishment orally and that the Hickman line was inserted during a medical procedure completed

almost a week before her death. The plaintiff there argued that *Reid* would not govern unless the

insured's heart had been perforated during insertion of the Hickman line. The *Litman* court

rejected this argument, stating as follows:

> Although the Hickman line did not perforate Lyndie's heart at the moment of
> insertion by a physician, it was introduced in order to prepare Lyndie for surgery
> and was used continuously to nourish her. Lyndie's medical treatment did not
> terminate once the medical procedure of installing the Hickman line was
> completed; rather, the use of the Hickman line was an ongoing process that
> constituted an important part of her medical treatment. *See generally Provident
> Life & Accident Insurance Co. v. Hutson*, 305 S.W.2d 837, 839 (Tex. Civ. App.
> 1957). Since Monumental's Policy expressly precludes coverage for losses
> caused by medical treatment, the exclusionary clause applies to bar coverage here.

*Litman*, 682 N.E.2d at 139.

 *Litman* and the various cases cited by the *Litman* court involve interpretations of the term

"medical treatment" with respect to fact situations different from those presented in this case.

*See also Whetsell v. Mutual Life Ins. Co.*, 669 F.2d 955, 956 (4th Cir. 1982) (death due to

infection caused by intravenous administration of saline solution; "every court that has

considered similar exclusionary clauses has held such provisions to exclude from coverage death

caused by various mishaps occurring during the course of medical treatment"); *Hammer v.

Lumberman's Mutual Casualty Co.*, 573 A.2d 699, 707 (1990) (losses caused by nutrition line

that disconnected; "[t]he only reasonable interpretation of the exclusionary provision is that it

specifically excludes...accidents caused by or resulting from 'medical or surgical treatment.'")

 In distinguishing *Senkier v. Hartford Life & Accident Co.*, 948 F.2d 1050 (7th Cir. 1991),

a case factually similar to that of *Litman*, the *Litman* court states as follows:

Although Lyndie did not require the Hickman line for the exact same reasons as plaintiff in *Senkier* needed a catheter, the Hickman line was nevertheless essential to Lyndie's well-being and recovery: it enabled Lyndie to undergo her third surgery in as many weeks. It is difficult to view the insertion of the Hickman line here as something other than medical treatment, that is, something "performed by a doctor or a surgeon on the body of the patient in the diagnosis of or in preparation for cure."

*Litman*, 682 N.E.2d at 139, quoting *Provident Life & Accident Ins. Co. v. Hutson*, 305 S.W.2d 837, 839 [sic][8] (Tex. Civ. App. 1957); citing *Dinkowitz v. Prudential Ins. Co.*, 216 A.2d 613 (Law. Div. 1966).

Although *Litman* involves different facts from the instant case, and does not involve a diagnostic procedure, the passage cited just above indicates that, under Illinois law, the losses arising from Mr. Brooks's CT scan procedure would be included in the exclusion at issue: it would be considered a "medical or surgical treatment" of a "disease" or a "bodily or mental infirmity." As with the Hickman line in *Litman*, the CT scan "was essential to [Mr. Brooks's] well-being and recovery" from whatever infirmity was causing the problems of which he had complained. *Litman*, 682 N.E.2d at 139. It was "something 'performed by a doctor or surgeon on the body of the patient *in the diagnosis of or preparation for cure*.'" *Id.* (Emphasis supplied). The *Litman* court took the latter quote from the *Hutson* case, cited above. That quote is part of the following passage in *Hutson*:

"The meaning of the word 'treatment' as used in the policy must be given a reasonable scope. It includes not merely the actual operation in a surgical case or the giving of a prescription in a nonsurgical case, but also the preliminary examination, including sometimes an exploratory operation or an exploratory examination. The treatment may, and generally does, include three stages: Preliminary, main, and final. Whatever is usually done to the patient or administered to him by a skilled physician or surgeon in any one of these stages is

---

[8]The pinpoint citation should be to page 840 of the *Hutson* opinion.

10

properly included under the term 'treatment,' even though it may not be an indispensable prerequisite." *Order of United Commercial Travelers v. Shane*, 8 Cir., 64 F.2d 55, 59. The opinion in this case quoted from, cites and relies upon *International Travelers Association v. Yates*, 29 S.W.2d 980, by the Texas Commission of Appeals and *Flint v. Travelers Insurance Co.*, Tex. Civ. App., 43 S.W. 1079. We believe that the term 'medical and surgical treatment' has the legal significance and meaning, as is set out in the opinion quoted above. Within such legal meaning must be included not only what the physician or surgeon views as treatment, that is, things done in an effort to relieve or cure a physical disease or infirmity, but also all of the things performed by a doctor or a surgeon on the body of the patient in the diagnosis of or in preparation for cure. The performance of the pneumoencephalogram must be regarded, in law, as similar to an exploratory operation by a surgeon, in which he opens the body of a patient in search of the cause of his ailment, discovers an incurable ailment, and closes the incision without attempting any curative surgery. This, undoubtedly, would be surgical treatment, as a matter of law.

*Hutson*, 305 S.W.2d at 839-40.

Based upon the *Litman* opinion, and the case law cited therein, it appears that the Illinois courts recognize that medical treatment exclusions also refer to diagnostic procedures. Other authorities, cited by JCPL and by the *Litman* court, are in agreement on this point. Under Illinois case law, the CT scan at issue here thus falls within the exclusionary clause for a "medical or surgical treatment" of a "disease" or a "bodily or mental infirmity," and the damages caused by the CT scan would fall within the exclusion.[9] JCPL's denial of a claim under the Policy for

---

[9]The plaintiff also argues that JCPL varies its interpretation of policy clauses and exclusions, depending on which reading give it an advantage over one making a policy claim. (Doc. 25 at 5-7). It cites the deposition testimony of Karen Newton, who was employed by JCPL as an Assistant Vice-President of Claims. (Newton Depo. (attached to Doc. 24) at 20-21). Most of this cited testimony is about provisions other than the medical exclusion at issue. (Doc. 25 at 5-7). With respect to the medical treatment exclusion, the plaintiff states as follows:

Karen Newton indicated that the seventh exclusion, the "medical treatment" exclusion, might not be used by J.C. Penney Life to deny a claim for benefits if a heart attack patient was electrocuted while hooked up to a machine, dropped to the floor by hospital personnel, or injured when another vehicle struck the ambulance in which he was being transported and receiving medical care.

11

damages encompassed by the medical treatment exclusion would therefore not constitute a

breach of contract. JCPL's motion for summary judgment as to the plaintiff's breach of contract

claims is therefore due to be granted.[10]

### B.     Bad Faith Claims

In Alabama, a plaintiff must meet several requirements in order to prove a bad-faith

failure to pay claim. A plaintiff must prove that

> (a) an insurance contract between the parties and a breach thereof by the
> defendant;
>
> (b) an intentional refusal to pay the insured's claim;
>
> (c) the absence of any reasonably legitimate or arguable reason for that refusal
> (the absence of a debatable reason);
>
> (d) the insurer's actual knowledge of the absence of any legitimate or arguable
> reason;
>
> (e) if the intentional failure to determine the existence of a lawful basis is relied
> upon, the plaintiff must prove the insurer's intentional failure to determine
> whether there is a legitimate or arguable reason to refuse to pay the claim.

*National Security Fire & Casualty Co. v. Bowen*, 417 So. 2d 179, 183 (Ala. 1982).

---

(Doc. 25 at 6). This testimony about possible responses by JCPL to hypothetical fact situations is not probative of the issues before the court and is irrelevant to the claims at hand.

[10]JCPL asserts an alternative basis for summary judgment: that Mr. Brooks died as a result of medical treatment he received for the anaphylactic shock (i.e., treatment for a "disease" or "infirmity") that was related to the CT scan procedure. (Doc. 27 at 10-12). Essentially, JCPL is asserting that the anaphylactic shock was a medical event separate and apart from the CT scan, and that the medical treatment administered therefor caused Mr. Brooks's death. It is unnecessary to analyze this argument, since JCPL has already prevailed under the analysis set forth above, which presumes that he died as a result of a diagnostic procedure. The court is also reluctant to make findings consistent with this argument because they hinge on the plaintiff's assertion that Mr. Brooks died as a result of the erroneous administration of lidocaine in response to his anaphylactic shock. There is no basis for this contention in the record, other than an unsubstantiated statement to that effect by Mrs. Brooks. (Doc. 20, Ex. 6 at 58).

The plaintiff cannot meet the first element of this cause of action, since the court has found hereinabove that JCPL is due summary judgment on the plaintiff's breach of contract claim. The plaintiff failed to overcome the motion for summary judgment with respect to the breach of the insurance contract claim, so she cannot meet the first requirement of proving a bad-faith failure to pay claim listed above. The court notes that it is also highly unlikely that the plaintiff could meet the third requirement listed above–the "absence of any reasonably legitimate or arguable reason for that refusal [to pay benefits]." As is evident from the court's analysis of the breach of contract claim, JCPL had a perfectly legitimate reason for refusing to pay benefits–it correctly concluded that the losses at issue were within an exclusion of the policy.

Since the plaintiff cannot meet the requirements for establishing a cause of action for bad faith failure to pay, JCPL's motion for summary judgment is due to be granted as to the plaintiff's bad faith claims.

## IV.   PLAINTIFF'S MOTION TO ALLOW A REPLY BRIEF

The defendant's motion for summary judgment was filed on August 23, 2001. (Doc. 18). The plaintiff had an opportunity and did, in fact respond to this motion with argument and evidence on September 13, 2001. (Doc. 25). The defendant filed a reply brief on September 24, 2001. (Doc. 27). The plaintiff's counsel moved to withdraw on June 7, 2002, according to the plaintiff's wishes. (Doc. 31). New counsel for the plaintiff filed a notice of an appearance on June 11, 2002. (Doc. 32). Plaintiff's new counsel filed a "Motion to Allow a Reply Brief in Opposition to the Defendant's Motion for Summary Judgment" on June 28, 2002. (Doc. 35). As the basis for the motion, plaintiff states that she "has only recently recused (sic) different counsel in this case. Plaintiff requests that the Court allow her counsel to submit a Reply Brief so that the

issues before the Court may be fully and adequately presented." (Doc. 35).

The defendant argues that the plaintiff's motion is untimely. (*See* Doc. 37). It argues that the motion for summary judgment was filed on August 23, 2001, and that, by order dated August 27, 2001 (doc. 23), the plaintiff was afforded ample opportunity to respond to the motion. (*Id.* at 2). The defendant asserts that the plaintiff took advantage of this opportunity, filing a fourteen-page responsive brief, accompanied by supporting evidence. (*Id.*). Pursuant to the court's order of August 27, 2001, the defendant filed a reply brief on September 24, 2001 (doc. 27), after which the motion was considered under submission by the court. The defendant complains that "[n]ow, more than nine (9) months after filing its Responsive Brief, Plaintiff seeks leave to file a second legal brief, asserting yet additional argument based upon evidence that was available at the time the original Responsive Brief was filed." (Doc. 37 at 2).

The court is not inclined to grant the plaintiff's motion to file an additional brief at this late date. The plaintiff's former attorney may have taken a different approach in responding to the motion for summary judgment than that taken by her current attorney, but this does not mean that the untimely brief is necessary for an adequate presentation of the issues.

Even if the court were to consider the arguments in the plaintiff's proposed reply brief, however, its ruling on the motion for summary judgment would remain the same. The plaintiff argues that Mr. Brooks had an anaphylactic reaction to the dye used for the purposes of a CT scan, and that his death should thus be characterized as an "accident" akin to a bee sting. She points out that the defendant's representative testified that an allergic reaction to a bee sting or to drugs could potentially be covered under the Policy. (Plaintiff's Proposed Reply Brief[11] at 1-2,

---

[11]This proposed reply brief is attached to doc. 35.

14

citing Newton Deposition at 62, 82-83). She submits (1) evidence that the defendant acknowledges the cause of death to be anaphylactic shock, (2) a letter that the Brooks family evidently procured from Mr. Brooks's attending physician to the effect that the anaphylactic shock should be considered an "accident," (3) the Alabama Death Certificate for Mr. Brooks, which lists the "Manner of Death" as being an "accident," and (4) a letter from the defendant acknowledging that the dye used in the CT scan is not a drug prescribed by a doctor to treat a disease or injury. (*Id*. at 2, Exs. 1-4).

　　　None of the arguments or evidence cited by the plaintiff convinces the court that Mr. Brooks's death is not within the exclusion. There seems to be little or no dispute that Mr. Brooks died because of an anaphylactic reaction to the dye administered to facilitate the CT scan. Although there may be a slight risk that any particular patient might experience such a reaction to the dye used to facilitate a CT scan, Mr. Brooks's death was "accidental" because it was not a result intended by medical personnel, nor was it a result that was expected or foreseen under the circumstances. Even so, the dye would not have been administered but for the need to facilitate a CT scan for the purpose of diagnosing the disease or infirmity that was evidently plaguing Mr. Brooks, the symptoms of which drove him to consult his physician. *See Litman*, 682 N.E.2d at 138.[12] As stated above, such diagnostic procedures are considered to be "treatment" for the

---

　　　[12]As is set forth above, the decedent in *Litman*, died of a heart attack caused by the insertion of a feeding tube. The plaintiff argued that the death resulted from an accident, but the court stated as follows:

> In the present case, there is no dispute that Lyndie's death was accidental. Unlike *Carlson* and *Vollrath*, the instant case does not turn on concerns of proximate cause and a preexisting illness. Rather, the focus here is on the "medical treatment" exclusionary clause, absent in *Carlson* and *Vollrath*, which prohibits coverage for "Sickness or its medical or surgical treatment." The issue is whether

purposes of insurance policy exclusions under Illinois law. Nothing cited by the plaintiff shows that the death was not due to the medical treatment of a disease or bodily infirmity, and thus within the exclusion from coverage.

## V.   CONCLUSION

For the reasons set forth above, this court finds that the "Plaintiff's Motion to Allow a Reply Brief in Opposition to the Defendant's Motion for Summary Judgment" (doc. 35) is due to be denied; the defendant's motion to supplement the record (doc. 39) to add page 20 of Dr. Bostick's deposition is due to be denied because it is already included in document 38 at exhibit A; and, the defendant's motion for summary judgment (doc. 18) is due to be granted and this action dismissed with prejudice. An appropriate order will be entered contemporaneously herewith.

**DONE** this 30th day of July, 2002.

JOHN E. OTT
United States Magistrate Judge

---

or not Lyndie's death occurred because of medical treatment.

*Litman*, 682 N.E.2d at 138. In this case as well, the decedent's death was "accidental," but the focus is on whether or not the death was the result of the treatment he received for a disease or bodily infirmity.

16